IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| ANTWAN D. JOLLEY, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:13-CV-247 (MTT) |
| | ) | |
| TRIAD MECHANICAL CONTRACTORS, | ) | |
| *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## ORDER

Plaintiff Antwan Jolley, an African-American male, contends he was

discriminated against because of his race and was subjected to a racially hostile work

environment in violation of Title VII and 42 U.S.C. § 1981.  He also asserts claims for

retaliation in violation of § 1981, intentional infliction of emotional distress, and a

violation of the Equal Pay Act.  Before the Court is the Defendants' motion for summary

judgment.  (Doc. 32).  For the following reasons, the motion is **GRANTED in part and

DENIED in part**.

### I.      BACKGROUND[1]

Defendant Triad Mechanical Contractors, Inc. is a mechanical, plumbing, sheet

metal, HVAC, and equipment services contractor.  (Doc. 37, ¶ 2).  During 2011 and

2012, Triad was under subcontract to install HVAC ductwork, related components, and

---

[1] The Plaintiff failed to respond to the Defendants' statement of material facts not in dispute as required
by Local Rule 56.  Thus, the facts are deemed admitted for purposes of the motion.  M.D. Ga. L.R. 56;
Fed. R. Civ. P. 56(e)(2).

water and sewage piping in conjunction with the construction of the Advanced Metal Finishing Facility at Robins Air Force Base in Warner Robins, Georgia.  (Doc. 38, ¶¶ 2, 3).  Defendant Jesse Blewer was the project manager and reported directly to Defendant Del Laquiere, Triad's president.  (Docs. 38, ¶ 2; 37, ¶ 2).  Defendant Jeff Throne, Triad's HVAC superintendent for the project, reported directly to Blewer.  (Doc. 38, ¶ 4).

Plaintiff Antwan Jolley began working for Triad on January 16, 2012.  (Doc. 36 at 96).  Like all civilian employees, Jolley received an identification badge when he was hired so he could gain access to the base.  (Docs. 38, ¶ 5; 36 at 23:22-24:1).[2] According to Triad, Jolley was paid less per hour than any other Triad employee because he had almost no HVAC experience.  (Docs. 37, ¶ 7; 38, ¶ 9).  He was hired to assist with HVAC work but was then moved to Triad's tool room.  Triad asserts the transfer was also due to Jolley's inexperience.  (Doc. 38, ¶ 10).  Neither Jolley's pay nor job classification, which was "laborer," changed when he was transferred to the tool room. (Doc. 38, ¶ 10).

Triad set its employees' hourly pay rates based on their experience at the time they were hired, and it was not Triad's practice to increase employees' pay rates during a project.  (Doc. 37, ¶¶ 7-8).  Both the highest paid Triad laborer and the highest paid non-management Triad employee on the project were African-American.  (Doc. 37, ¶ 7).

### A.  Security Badge Incident

Around April 2012, Jolley left his ID badge in his car, which his mother drove and left at the Atlanta airport for a few days while she was on a trip.  (Doc. 36 at 25:17-24,

_____
[2] The page numbers are based on the deposition pages numbers instead of the CM/ECF page numbers.

63:16-18).  The first day Jolley was without his badge, his cousin, a sergeant in the

military, escorted him onto the base.  (Doc. 36 at 28:13-24, 29:18-25).  Jolley called

Throne from the base's security gate and told him he needed a temporary replacement

badge until his mother returned with his car, but Throne did not provide Jolley with

another badge and instead told him he could return to work after he retrieved his badge.

(Docs. 36 at 25:17-24; 39, ¶ 6).[3]  Jolley contends that "Steven," a Caucasian employee,

lost his badge about a month later and Triad replaced it.  (Doc. 36 at 31:25-32:11).

Unlike Jolley, Steven was requesting a replacement badge and not a temporary one.

(Doc. 36 at 32:2-4).

### B.  Jolley's Termination

On June 18, 2012,[4] Triad employees Robert Gill (African-American) and Terry

Carson (Caucasian) got into a fight in a parking lot off the base after their shift ended.

According to Jolley, he stopped his car in an effort to break up the fight and saw Carson

hitting Gill with a bat.  After Jolley tried to intervene, Gill hit Carson in the face with a

stick.  Carson fell, hit his head on the concrete, and became unconscious.  (Docs. 36 at

40:23-44:2; 22-1 at 1).  He was hospitalized and died from his injuries several days

later.  (Doc. 38, ¶ 20).  Blewer and Throne went to the hospital after the fight and spoke

to the Triad employees who were there.  (Doc. 38, ¶ 16).  Besides Carson and Gill, the

Triad employees present at the fight were Jolley, Robert Grant (African-American),

Carlos Simmons (African-American), and Rick White (Caucasian).  (Docs. 36 at 46:23-

---

[3] Jolley testifies Throne told him he would get him a badge but then later told Jolley he was fired instead.
(Doc. 36 at 25:24-26:11).  Throne then allegedly told the unemployment office Jolley was not fired and
told Jolley to come back to work.  (Doc. 36 at 26:11-23).  Jolley has not pointed to this testimony in
opposition to the Defendants' statement of facts or otherwise contested the above facts.

[4] Jolley testifies the fight took place on June 17.  (Doc. 36 at 44:1-2).  The Warner Robins Police
Department incident report attached to the amended complaint lists the date as June 18.  (Doc. 22-1 at
1).  However, the precise date does not affect the resolution of the motion.

47:2, 47:14-21, 48:7-10; 38, ¶ 16).  Carson's son Chris Copeland (Caucasian) was also present at the fight.  (Doc. 36 at 47:5-9, 48:5-6, 50:3-6).  Copeland was not employed by Triad but had been working on the same project at the base.  (Doc. 38, ¶ 17).[5]

After speaking with the employees present at the hospital, Blewer called Laquiere to brief him on what happened.  (Doc. 38, ¶ 18).  Laquiere decided to terminate all employees present at the fight because he was concerned about work disruption and hindrance of the project's completion.  (Doc. 37, ¶ 10).  Grant, Simmons, White, Gill, and Jolley were fired the next day.  (Docs. 36 at 74:7-13; 38, ¶¶ 16, 19).  In his deposition, Jolley contends White was not fired.  (Doc. 36 at 49:17-23).  Laquiere was not aware of any complaints Jolley had about his job when he made the decision to terminate the employees.  (Doc. 37, ¶ 11).

Jolley contends the Defendants have "black balled" him from other potential employment, which is evidenced by his inability to get a job in Macon despite his previous work on the base and his "hell of a resume."  (Doc. 36 at 86:5-87:25).  Since his termination, Jolley has not applied for employment with any of the other contractors working on the base project.  (Doc. 36 at 86:5-7).

### C.  Harassment Allegations

Jolley's complaint also alleges he was subjected to a racially hostile work environment.  During a confrontation on the job, Triad employee James Hudson (Caucasian) called Gill a "coon," and Jolley witnessed the incident.  (Docs. 36 at 32:19-33:11, 35:4-16; 39, ¶ 7).  Gill reported the incident to Throne, and Throne allowed Gill to

---

[5]  Jolley appears to contend that Copeland worked for one of Triad's subcontractors and that Triad had control over his employment.  (Doc. 36 at 84:16-85:24).  However, according to Laquiere, "Triad did not have any parent, subsidiary, or affiliated companies working on the Robins Air Force Base project, nor did it hire or retain any other company to perform work for which Triad was responsible."  (Doc. 46, ¶ 11).

go home for the rest of the day because he was upset. (Doc. 39, ¶ 7). After the incident, Throne and Blewer had a meeting with the HVAC employees. (Docs. 38, ¶ 13; 39, ¶ 8). During the meeting, Throne told the employees that Triad would not tolerate racial slurs on the job. (Docs. 38, ¶ 13; 39, ¶ 8). Gill, Hudson, and Jolley were also placed on separate work crews. (Doc. 39, ¶ 9). According to Throne and Blewer, they never received another complaint of racial harassment or discrimination on the project, and they did not hear other Triad employees use racially derogatory language. (Docs. 38, ¶ 14; 39, ¶ 10).

Jolley cannot recall a specific instance where he heard Throne or Blewer use the terms "coon" or "nigger" other than at the meeting when they told the HVAC employees that racial slurs were prohibited. (Doc. 36 at 21:5-10, 34:16-23, 36:10-17, 38:5-39:13). Jolley does say that Throne and Blewer referred to him as "boy" and that Throne would say, "Boy, go to your cell."[6] (Doc. 36 at 24:14-22, 38:16-25). However, Jolley never contacted Laquiere to complain about discriminatory conduct, and Laquiere never received complaints from other employees on the project. (Docs. 36 at 68:25-69:11; 37, ¶ 12).

While these facts are admitted by Jolley, his deposition testimony further provides that he and other African-American employees were called "coon, nigger, [and] boy" from the time he started working for Triad. (Doc. 36 at 21:6-10). He also testifies that Hudson and Gill got into a fight on the job because Hudson called Gill a "coon" and references other fights on the job, though he does not provide more detail about these other fights. (Doc. 36 at 32:21-33:8, 34:17-23).

---

[6] Throne referred to the tool room where Jolley worked as his cell. (Doc. 36 at 24:18-22).

## II.     DISCUSSION

### A.  Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The non-moving party does not satisfy its burden "if the rebuttal evidence is merely colorable, or is not significantly probative of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249-50). Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion.  Fed. R. Civ. P. 56(e)(2).  However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions,

not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## B.  Title VII and § 1981 Claims[7]

### 1.  *McDonnell Douglas* Framework

A Title VII plaintiff may prove his case directly or circumstantially.  Here, there is no direct evidence of discrimination, so the Plaintiff must rely on circumstantial evidence.  The framework for analyzing circumstantial evidence to establish a prima facie case of discrimination is provided in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Pursuant to *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination, the test for which differs slightly for each claim.  If a plaintiff establishes a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).  This burden of production means the employer "need not persuade the court that it was *actually* motivated by the proffered reasons" but must produce evidence sufficient to raise a genuine issue of fact as to whether it discriminated against the plaintiff.  *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (emphasis added) (internal quotation marks and citation omitted).

A plaintiff then has the opportunity to show that the employer's stated reason is in fact pretext for discrimination.  "The plaintiff can show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of

---

[7] It appears from the amended complaint that the Plaintiff is asserting claims of wrongful termination and hostile work environment under both Title VII and § 1981 but is asserting a claim for retaliation only under § 1981.

credence.'" *Id.* (quoting *Burdine*, 450 U.S. at 256).  Put another way, "[a] plaintiff may

… survive summary judgment by 'presenting evidence sufficient to demonstrate a

genuine issue of material fact as to the truth or falsity of the employer's legitimate, non-

discriminatory reasons.'" *Freeman v. Perdue Farms Inc.*, 496 F. App'x 920, 925 (11th

Cir. 2012) (quoting *Evans v. McClain of Ga., Inc.,* 131 F.3d 957, 965 (11th Cir.1997)).

"If the employer proffers more than one legitimate, nondiscriminatory reason, the

plaintiff must rebut each of the reasons to survive a motion for summary judgment."

*Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007) (citation

omitted).

### 2.  Wrongful Termination

Title VII makes it unlawful for an employer to "discharge any individual …

because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  The same analytical

framework and proof requirements apply to claims of race discrimination under 42

U.S.C. § 1981.  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

Thus, the Court's analysis of Jolley's Title VII claims also applies to his § 1981 claims.

To establish a prima facie case, Jolley must show that: "(1) he is a member of a

protected class; (2) he was qualified for the position; (3) he suffered an adverse

employment action; and (4) he was replaced by a person outside his protected class or

was treated less favorably than a similarly-situated individual outside his protected

class." *Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342

F.3d 1281, 1289 (11th Cir. 2003).

The Defendants argue Jolley has failed to meet his prima facie case that he was

wrongfully terminated because of his race.  Because Triad terminated all of its

employees who were present at the fight between Gill and Carson (including the only Caucasian employee present besides Carson), the Defendants contend Jolley cannot show he was treated less favorably than a similarly-situated individual outside his protected class. Additionally, the Defendants contend Jolley cannot show their asserted reason for firing him—that he was present at the fight—was a pretext for discrimination.

Jolley points to his deposition testimony that Triad did not fire White or Copeland, the only other Caucasian individuals present at the fight besides Carson. (Doc. 36 at 84:16-85:4). The Defendants argue Jolley's testimony is insufficient to create a genuine issue of material fact because Jolley does not have personal knowledge of who Triad employed or who it terminated. As a non-management employee, the Court agrees Jolley would not have personal knowledge of Triad's employment decisions. His subjective belief that Triad—and not the main contractor or another subcontractor working on the same project—employed Copeland is insufficient to create a genuine issue of material fact given that Triad has presented the declaration of Jesse Blewer, Triad's project manager, who stated Copeland was not employed or controlled by Triad. (Doc. 38, ¶ 17).

It is not disputed that White was employed by Triad. Initially, the Defendants simply asserted White was fired. While Jolley admitted this fact by failing to respond to the Defendants' statement of facts, in his deposition he maintained White was not fired because he saw White "go right back to the base to the same job I was going to go." (Doc. 36 at 84:21-23).[8] Clearly, White's employment status after the fight should not be

---

[8] This testimony is a little confusing because Jolley apparently believes that neither Copeland nor White worked directly for Triad, but he believes "Triad was paying their company, so it was still like they were working for Triad." (Doc. 36 at 84:24-25). As discussed above, Laquiere stated Triad had no

a matter of disputed fact.  Therefore, the Court allowed the Defendants to submit employment records and gave Jolley an opportunity to respond.  Triad submitted the "Employee Setup Records" for both Jolley and White, which show both individuals' employment ended on June 18, 2012.  (Doc. 46 at 5, 7).  Jolley did not challenge these records.  Thus, there is no genuine dispute about whether White was terminated after the fight.  Because Jolley has not presented evidence of a similarly-situated individual outside his protected class who was treated more favorably than he was, he has failed to meet his prima facie case.  For the same reason, he has failed to show the Defendants' asserted reason for firing him was a pretext for discrimination.

The only other evidence of pretext Jolley points to is Throne's and Blewer's derogatory comments toward him.  However, this evidence is also insufficient to create a genuine issue of fact that the Defendants' asserted reason for terminating him was pretextual.[9]  The Defendants have presented evidence that all employees present were terminated following the fight and that neither Throne nor Blewer made the termination decision.  For the foregoing reasons, the Defendants are entitled to judgment as a matter of law on this claim.

---

subcontractors on the project.  *See supra* note 5.  Additionally, Jolley claims to have seen White on the base after he was terminated but also testified he never went back to the base.  (Doc. 36 at 93:1-14).

[9] The Court recognizes that the *McDonnell Douglas* framework is not the "*sine qua non*" for a plaintiff to survive a summary judgment motion in an employment discrimination case and that "[a] triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (internal quotation marks and citation omitted).  However, Jolley has not presented enough circumstantial evidence for a jury to infer intentional discrimination.

### 3.  Other Disparate Treatment Claims

Jolley also appears to claim he was discriminated against by being paid less than any other Triad employee, by Throne's refusal to get him a temporary ID badge when his was unavailable, and by being "black balled" from other potential employment.[10] Title VII also prohibits discrimination against an individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).

Even assuming Jolley can establish a prima facie case with respect to his discriminatory pay allegation, he has not proffered any evidence to rebut the Defendants' asserted reason that he was paid less than other Triad employees because he had less HVAC experience.  Nor has he submitted any other evidence to create a genuine issue of fact that the Defendants' proffered reason is a pretext for discrimination.  The Defendants have submitted evidence that both the highest paid laborer and the highest paid non-management employee were African-American and that Triad set its employees' pay based on skill level.  (Doc. 37, ¶ 7).

Jolley has also failed to establish a prima facie case that he was discriminated against when he was denied a temporary ID badge.  By his own testimony, the Caucasian employee who was allegedly treated more favorably needed a permanent replacement ID badge, as opposed to a temporary one.  (Doc. 36 at 32:2-4).  Thus, the two are not similarly situated.  Even if Jolley could establish a prima facie case, the Defendants have presented Blewer's and Throne's declarations in which they state they were unaware of a procedure for obtaining a temporary ID badge.  (Docs. 38, ¶ 8; 39, ¶

---

[10] Jolley's attorney made no argument on these claims in his response brief and instead only included allegations relating to these claims in the background portion of his brief.

5).  Throne also stated he wished to avoid the cost of replacing Jolley's badge because it was only temporarily unavailable.  (Doc. 39, ¶ 6).  Jolley has wholly failed to respond to the Defendants' asserted reason and thus has not created a genuine issue of fact that it is a pretext for discrimination.

As to the claim he has been "black balled," Jolley has provided no evidence the Defendants did anything to hamper his future employment.  Indeed, Jolley admits he did not apply for other jobs on the base.  All he has presented is speculative testimony that because he has not had a job in three years, Triad must have had something to do with it.[11]  (Doc. 36 at 86:9-87:25).  Thus, Jolley has not even created a genuine issue of fact that the Defendants engaged in any behavior to "black ball" him.[12]

### 4. Hostile Work Environment[13]

To establish a prima facie case for a hostile work environment claim, Jolley must show: (1) he is a member of a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on his membership in the protected class; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under either

---

[11] Jolley seems to think that his employment difficulty might be a consequence of media reports about Carson's death.  That could be, but he provides no evidence that the Defendants are responsible for these reports.

[12] The Defendants also reference Jolley's claims based on their failure to provide him with insurance papers and 401(k) papers.  However, Jolley's amended complaint does not contain any allegations regarding insurance papers or 401(k) papers, and he has not moved to amend his complaint to include these allegations.  The Defendants appear to rely on Jolley's statement in his deposition that he did not receive these papers.  (Docs. 34, ¶ 32; 36 at 25:6-14).  However, Jolley does not even point to this testimony in response to the Defendants' motion.  Thus, the Court concludes he is not asserting a discrimination claim based on these alleged actions.

[13] Jolley's attorney also made no argument on this claim in his response brief and instead only included allegations relating to this claim in the background portion of his brief.

vicarious or direct liability.  *Jones v. UPS Ground Freight,* 683 F.3d 1283, 1292 (11th Cir. 2012).  The plaintiff must meet both a subjective and objective test to show the harassing conduct was severe or pervasive.  Thus, "[t]he burden is on the plaintiff to demonstrate that he perceived, and that a reasonable person would perceive, the working environment to be hostile or abusive."  *Id.* at 1299 (citation omitted).  When evaluating whether the harassment is objectively severe or pervasive, the Court considers: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002).  The relevant inquiry is "whether, under the totality of the circumstances, a reasonable person would find the harassing conduct severe or pervasive [enough] to alter the terms or conditions of the plaintiff's employment."  *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1251 (11th Cir. 2014).

The Defendants argue they are entitled to summary judgment because Jolley has failed to meet the fourth element of his prima facie case: that the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment. The Defendants do not contest that Jolley subjectively perceived his working environment was hostile.  Rather, they contend that based on the evidence of harassment he has presented a reasonable person would not find his working environment hostile and abusive.  The Court disagrees.

The specific incidents of harassment that Jolley testifies about, and that the Defendants reference in their statement of facts, are: (1) Hudson's calling Gill a "coon"

in Jolley's presence and (2) Throne and Blewer's referring to Jolley as "boy" and Throne's telling him to "go to [his] cell."  By virtue of failing to respond to the Defendants' statement of facts, Jolley has admitted for purposes of the motion that he cannot recall a specific time he heard Throne or Blewer use the words "nigger" or "coon" other than during a meeting in which they told employees racial slurs were forbidden in the workplace.  (Doc. 34, ¶ 55).  However, Jolley also testifies more generally that "[f]rom the time I started working … we got called all the names, coon, nigger, boy, and sometimes it used to be in front of … [Blewer] or [Throne]."  (Doc. 36 at 21:6-10).  Though Jolley complained to his supervisors and they held a meeting advising employees not to use those terms, he says the use of racial slurs continued without anyone getting fired.  (Doc. 36 at 33:25-35:3).[14]

Jolley also fleshes out in more detail the incident where Hudson called Gill a "coon," saying the two got into a fight on the job.  (Doc. 36 at 32:21-33:8).  He further testifies that both the fight between Hudson and Gill and the fight between Carson and Gill (after which Carson died and Jolley was fired) stemmed from the use of racial slurs on the jobsite.  (Doc. 36 at 32:21-33:8, 45:4-46:15).  Jolley also references other fights on the job but does not provide more detail.  (Doc. 36 at 34:17-23).

The Eleventh Circuit's recent decision in *Adams* is instructive about what evidence is sufficient to create a genuine dispute of material fact on whether harassing conduct created an objectively hostile work environment.  754 F.3d 1240 (11th Cir. 2014).  The district court granted summary judgment to the defendant on the hostile work environment claims of 13 plaintiffs.  The Eleventh Circuit reversed summary

---

[14] For purposes of the motion, Jolley has admitted Blewer and Throne received no more complaints from employees and heard no more racial slurs being used after the Hudson incident.  (Doc. 34, ¶ 54).  However, this does not necessarily mean the use of racial slurs stopped.

judgment as to 7 of the 13 plaintiffs, finding they presented enough evidence to create a genuine dispute of material fact that their work environments were objectively hostile.

The Court concludes the evidence Jolley has presented in this case is similar in degree and severity to the evidence of the plaintiffs the Eleventh Circuit allowed to proceed in *Adams*. Two of the *Adams* plaintiffs in particular presented evidence comparable to Jolley's. One plaintiff frequently saw racist graffiti in the men's room, saw white coworkers wear Confederate flag[15] apparel "numerous times," heard his supervisor call someone a racial slur twice, and was asked about the racial slur by his supervisor the second time. *Id.* at 1253. Another plaintiff saw an employee wear a Confederate flag shirt once, saw racist graffiti in the men's restroom regularly, and his supervisor humiliated him with a racial slur. *Id.* at 1253-54. In comparison, from the time Jolley started working for Triad, he and other African-American employees were allegedly called racially derogatory names, he saw racial tension in the workplace lead to at least two fights, and his supervisors called him "boy" and told him to "go to [his] cell." Considering the totality of the circumstances, the Court cannot say that a reasonable jury could not find Jolley's work environment was objectively hostile.

The Defendants do not challenge other elements of the prima facie case. Rather, they argue Defendants Blewer, Throne, and Laquiere are not individually liable for any of Jolley's claims based on Title VII or § 1981, including his hostile work environment claims. As to the Title VII hostile work environment claim, the Defendants are correct. *Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 827 (11th Cir. 2000). As to the § 1981 hostile work environment claim, the Court agrees Laquiere is

---

[15] The court did not elaborate on the significance of the presence of the Confederate flag in the workplace.

not individually liable.  However, Jolley has "made an affirmative showing linking

[Blewer and Throne] with the discriminatory action," which for this claim is the creation

of a racially hostile work environment.  *Barnes v. O'Neil Transp. Servs. of Ga., Inc.*,

2014 WL 1813715, at *2 (M.D. Ga.) (internal quotation marks and citation omitted).

Specifically, there is evidence that some of the racially derogatory comments

contributing to the hostile work environment were made by Blewer and Throne.  Thus,

the Court cannot agree Blewer and Throne are entitled to summary judgment on

Jolley's § 1981 hostile work environment claim.

### 5.  Retaliation under § 1981[16]

---

[16] The Defendants argue Jolley has abandoned his remaining claims by failing to address them in his response to their motion for summary judgment.  The Eleventh Circuit has held in several unpublished cases that a plaintiff may abandon claims on summary judgment by failing to address them in his response brief.  *See Gailes v. Margeno Cnty. Sheriff's Dep't*, 916 F. Supp. 2d 1238, 1241-42, 1241 n.6 (S.D. Ala. 2013) (collecting cases).  However, the court has not gone so far in a published decision.  *See Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 971 n.36 (11th Cir. 2008) (alternatively holding in a footnote that plaintiff abandoned a discrimination claim on summary judgment *and* that there was an undisputed nondiscriminatory reason for supervisor's decision); *Rd. Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding district court properly treated as abandoned an alternative *theory* for why the defendant should be compelled to arbitrate, even though court framed the issue as an abandoned *claim*).  Additionally, the Eleventh Circuit has held in a published decision that a district court cannot simply grant an unopposed motion for summary judgment and must consider the merits of the motion.  *United States v. One Piece of Real Prop.*, 363 F.3d 1099, 1101-02 (11th Cir. 2004).  The rationale of the court's decision was based on former Fed. R. Civ. P. 56(c)'s language that summary judgment is appropriate if "'there is *no genuine issue as to any material fact* and … the moving party is entitled to judgment as a matter of law.'"  *Id.* at 1101 (emphasis added by Eleventh Circuit).  Current Rule 56(a) similarly provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Two district courts in this circuit have resolved the apparent conflict in Eleventh Circuit precedent in the following manner:

> Where a party wholly fails to respond to a summary judgment motion, the district court must make sure that it nonetheless is appropriate to enter summary judgment against the party that did not respond; in contrast, where the non-moving party fails to address a particular claim asserted in the summary judgment motion but has responded to other claims made by the movant, the district court may properly consider the non-movant's default as intentional and therefore consider the claim abandoned.

*Rossi v. Fulton Cnty., Ga.*, 2013 WL 1213243, at *13 n.8 (N.D. Ga.) *report and recommendation adopted sub nom. Rossi v. Fulton Cnty. Bd. of Assessors/Fulton Cnty. Tax Assessors Office*, 2013 WL 1213139 (N.D. Ga.); *see also Powell v. Am. Remediation & Envtl., Inc.*, ___ F. Supp. 3d ___, 2014 WL 6609388, at *6 n.9 (S.D. Ala.) (citing *Rossi*).  Because the Eleventh Circuit has not directly spoken to the issue in a published decision, and because the Court is not sure the approach taken by the other district courts is

A plaintiff establishes a prima facie case for race-based retaliation under 42 U.S.C. § 1981 by showing: "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the adverse action." *Bryant v. Jones*, 575 F.3d 1281, 1307-08 (11th Cir. 2009). Jolley has failed to show a causal connection between his protected activity (complaining about racial slurs in the workplace) and the adverse action (termination). The Defendants presented evidence that Laquiere made the decision to terminate Jolley and other Triad employees following the fight between Gill and Carson and that Laquiere was unaware of any complaints Jolley made. Jolley has not submitted evidence to the contrary, nor has he pointed to any other evidence to show a causal connection. Thus, the Defendants are entitled to judgment as a matter of law.

### C. Other Claims

#### 1. Intentional Infliction of Emotional Distress

Jolley has brought an intentional infliction of emotional distress claim against Defendants Triad, Blewer, and Throne. To prevail on a claim for intentional infliction of emotional distress, the Plaintiff must demonstrate that:

> (1) the conduct giving rise to the claim was intentional or reckless; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. The defendant's conduct must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law.

---

consistent with Rule 56, the Court declines to treat any of the Plaintiff's claims as abandoned and instead considers the merits of the Defendants' motion on these claims.

*Steed v. Fed. Nat'l Mortg. Corp.*, 301 Ga. App. 801, 810, 689 S.E.2d 843, 851-52 (2009) (internal quotation marks and citation omitted).  "The rule of thumb in determining whether the conduct complained of was sufficiently extreme and outrageous is whether the recitation of the facts to an average member of the community would arouse her resentment against the defendant so that she would exclaim[,] 'Outrageous!'"  *Wilcher v. Confederate Packaging, Inc.*, 287 Ga. App. 451, 453, 651 S.E.2d 790, 792 (2007) (internal quotation marks and citation omitted).  Factors to consider include "the existence of a relationship in which one person has control over another, the actor's awareness of the victim's particular susceptibility, and the severity of the resultant harm."  *Trimble v. Circuit City Stores, Inc.*, 220 Ga. App. 498, 499-500, 469 S.E.2d 776, 778 (1996) (citations omitted).

Jolley has failed to meet the second element of an intentional infliction of emotional distress claim under Georgia law.  As a matter of law, the use of racial slurs by coworkers and supervisors in the workplace is not extreme and outrageous conduct.  *See Ghodrati v. Stearnes*, 314 Ga. App. 321, 323-24, 723 S.E.2d 721, 723 (2012) (coworkers' repeatedly calling plaintiff racist and derogatory names and posting inappropriate signs about him was not sufficiently extreme and outrageous); *Lockhart v. Marine Mfg. Corp.*, 281 Ga. App. 145, 147-48, 635 S.E.2d 405, 407-08 (2006) (four incidents of racist comments by coworkers and supervisors not sufficiently extreme and outrageous).

### 2.  Equal Pay Act

An employee demonstrates a prima facie case of an Equal Pay Act violation by showing that the employer "pays different wages to employees of *opposite sexes* for

equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1018 (11th Cir. 1994) (emphasis added) (internal quotation marks and citation omitted).  Because Jolley has only alleged he was paid lower wages than other male employees, his Equal Pay Act claim fails as a matter of law, and the Defendants are entitled to summary judgment.

## III.    CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment (Doc. 32) is **GRANTED in part and DENIED in part**.  The Defendants are entitled to summary judgment on all claims except the Plaintiff's Title VII hostile work environment claim against Defendant Triad and the Plaintiff's 42 U.S.C. § 1981 hostile work environment claim against Defendants Triad, Blewer, and Throne.  Because Defendant Laquiere is entitled to summary judgment on all claims asserted against him, the Clerk is **DIRECTED** to terminate him as a Defendant in this action.


**SO ORDERED,** this 23rd day of March, 2015.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL
UNITED STATES DISTRICT COURT